Reuben D. Nathan, Esq. (SBN 208436)
**NATHAN & ASSOCIATES, APC**
2901 W. Coast Hwy., Suite 200
Newport Beach, CA 92663
Office: (949) 270-2798
Email: rnathan@nathanlawpractice.com

Ross Cornell, Esq. (SBN 210413)
**LAW OFFICES OF ROSS CORNELL, APC**
P.O. Box 1989 #305
Big Bear Lake, CA 92315
Office: (562) 612-1708
Email: rc@rosscornelllaw.com

Attorneys for Plaintiff, JOHN TASKER

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOHN TASKER, on behalf of himself and all similarly situated persons,<br><br>Plaintiff,<br><br>v.<br><br>U.S. NEWS & WORLD REPORT, L.P., a Delaware limited partnership,<br><br>Defendant. | Case No.:<br><br>**CLASS ACTION COMPLAINT**<br><br>1) Cal. Penal Code § 631<br>2) 18 U.S.C. § 2511(1)(a)<br>3) Cal. Bus. & Prof. Code § 17200, *et seq.*<br>4) Cal. Constitution Art. I § 1<br>5) Intrusion Upon Seclusion<br>6) Unjust Enrichment |

1

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

Plaintiff JOHN TASKER ("Plaintiff") files this class action complaint on behalf of himself and all others similarly situated (the "Class Members") against Defendant U.S. NEWS & WORLD REPORT, L.P., a Delaware limited partnership ("Defendant" or "U.S. News & World Report"). Plaintiff brings this action based upon personal knowledge of the facts pertaining to himself, and on information and belief as to all others, by and through the investigation of undersigned counsel.

## I.    NATURE OF THE ACTION

1.    This is a class action lawsuit brought on behalf of all California residents who have accessed and used www.usnews.com (the "Website"), a website that Defendant provides for public access and use.

2.    During his use of the Website, Plaintiff navigated to multiple pages on the Website, unaware that Defendant was causing and permitting Third Parties to intercept the content of his communications and reveal his personal searches and content interests.

3.    Defendant caused the interception of the contents of Plaintiff's communications with the Website, including the page URLs identifying what he was browsing and/or the referrer URLs reflecting prior navigation, which were transmitted to the Third Parties during the page-load process itself.

4.    As set forth in the Specific Allegations section of this Complaint below, Defendant surreptitiously embeds and operates third-party tracking technologies on the Website that intercept the contents of users' electronic communications, including the page URLs reflecting what users are browsing, in real time and without notice or consent. Defendant intentionally deploys these technologies to accomplish its commercial objectives, including identity resolution, cross-session behavioral profiling, audience segmentation, and the monetization of users' browsing activity through targeted advertising and real-time bidding.

5.    Defendant deploys these interception technologies in violation of the California Invasion of Privacy Act, Cal. Penal Code § 631, and the Federal Wiretap Act, 18 U.S.C. § 2511(1)(a). Defendant has done so from prior to the beginning of the class

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

period in this case and continuously through to today and ongoingly.

## II.   GENERAL ALLEGATIONS

6.     A pixel tracker, also known as a web beacon, is a tracking mechanism embedded in a website that monitors user interactions. It typically appears as a small, transparent 1x1 image or a lightweight JavaScript snippet that activates when a webpage is loaded, or a user performs a tracked action.

7.     When triggered, the pixel causes the user's browser to transmit data to third-party servers, including the contents of the user's communications with the Website such as page URLs identifying what the user is browsing, referrer URLs reflecting prior navigation, session-level identifiers, and browser and device characteristics.

8.     When users visit the Website, Defendant causes tracking technologies to be embedded in visitors' browsers. These include, but are not limited to, the following:

- The Comscore Tracker
- The LiveIntent Tracker
- The Trade Desk Tracker

9.     The third parties who operate the above-listed trackers use the intercepted contents of users' communications collected via the Website for their own independent purposes tied to broader advertising ecosystems, profiling, and data monetization strategies, which go beyond Defendant's direct needs, for their own financial gain. The above-listed trackers are referred to herein collectively as the "Trackers" and their operators below are referred to collectively as the "Third Parties."

10.     The Trackers are operated by distinct third parties, including Comscore, Inc. (also branded as Scorecardresearch, as to the Comscore audience-measurement tracker), LiveIntent, Inc. (as to the LiveIntent tracker), and The Trade Desk, Inc. (as to the Trade Desk programmatic-advertising tracker) (collectively, the "Third Parties"). Defendant knowingly embeds and deploys the Trackers on the Website to facilitate the third parties' interception of the contents of users' electronic communications. Defendant knowingly embeds and deploys the Trackers on the Website and configures

3

them to execute automatically within users' browsers upon page load and navigation. As a result, Defendant causes the interception and transmission of the contents of users' electronic communications with the Website to servers controlled by the Third Parties. Defendant's conduct is intentional and coordinated, as the Trackers operate pursuant to Defendant's deliberate configuration and are not necessary to render the Website's core content or functionality.

11.    The third-party tracking code executed contemporaneously with each page load and navigation event initiated by Plaintiff's browser. As the browser initiated each HTTP request to retrieve Website content, embedded scripts automatically caused the interception and transmission of the contents of users' communications with the Website to remote third-party endpoints during the page-load process itself, before the requested page finished rendering and without any user interaction or authorization.

12.    Plaintiff and the Class Members did not consent to the installation, execution, embedding, or injection of the Trackers on their devices and did not consent to the contents of their communications with the Website being intercepted by third parties. The Website did not display any consent banner, pop-up, cookie notice, or other authorization mechanism requesting permission before deploying the Trackers to intercept user communications. Defendant did not obtain express prior consent for the interception and transmission of the contents of users' communications for advertising, analytics, or monetization purposes.

13.    Generalized references herein to users, visitors and consumers expressly include Plaintiff and the Class Members.

## III.    PARTIES

14.    Plaintiff JOHN TASKER is a California citizen residing in San Bernardino County, California, and has an intent to remain there. Plaintiff was in California when he visited the Website, which occurred during the class period including but not limited to on April 28, 2026. The allegations set forth herein are based on the Website as configured when Plaintiff visited it.

4

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

15.     U.S. News & World Report, L.P. is a Delaware limited partnership that owns, operates, and controls the Website, an online news, education, health, and consumer-information platform through which U.S. News & World Report publishes news reporting, ranking and best-of guides for colleges and graduate schools, hospital and healthcare quality information, consumer rankings of automobiles, financial products, and travel destinations, and editorial coverage of national news, politics, and consumer interest topics for readers nationwide.

16.     Defendant maintains its principal offices in Washington, D.C. Through the Website and related digital platforms, U.S. News & World Report conducts media and publishing business nationwide and serves readers in California and throughout the United States.

## IV.    JURISDICTION AND VENUE

17.     U.S. News & World Report, L.P. is subject to personal jurisdiction in this District under Federal Rule of Civil Procedure 4(k)(1)(A) and California's long-arm statute, Cal. Code Civ. Proc. § 410.10, which authorizes the exercise of jurisdiction on any basis not inconsistent with the United States or California Constitutions.

18.     U.S. News & World Report has cultivated California as a significant market for its editorial content, education-rankings products, and consumer guides. The Website serves as a primary digital channel through which U.S. News & World Report distributes its news articles, college and graduate-school rankings, hospital and healthcare quality rankings, and consumer-information content to California readers. U.S. News & World Report markets and publishes California-targeted ranking and guide content to California audiences, including individual California university, hospital, and high school profiles within its rankings.

19.     In furtherance of those operations, U.S. News & World Report entered into and maintained commercial partnerships with California-headquartered data and advertising companies, including The Trade Desk, Inc., headquartered in Ventura, California.

5

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

20.     Through those partnerships, U.S. News & World Report embedded third-party tracking technologies into the Website that transmit California users' communications to data infrastructure and servers operated by California-headquartered companies. Plaintiff, a California resident, accessed the Website from California; the tortious interception of his communications occurred on his device in California; and the intercepted data flowed in part to servers operated by The Trade Desk, Inc., which operates from California, and to servers operated by other Tracker companies. Plaintiff's claims arise directly from U.S. News & World Report's purposeful direction of its Website and embedded data-collection systems at California residents and its use of California-based infrastructure to capture and exploit their private communications.

21.     U.S. News & World Report deliberately reached out beyond its home state of Delaware and its Washington, D.C. principal offices by knowingly installing the Comscore, LiveIntent, and Trade Desk Trackers onto unsuspecting California users' devices so that it could later use and monetize the data it obtained from those Trackers, in a manner that was neither random, isolated, nor fortuitous.

22.     U.S. News & World Report's own U.S. State Privacy Notice confirms the conduct alleged herein. U.S. News & World Report expressly identifies the categories of personal information it collects from visitors to the U.S. News Services, including "Services usage information (such as search, browsing history, and other interactions with the U.S. News Services)" and "Inferences from PI collected (we may infer your interest in certain content based on the pages of the U.S. News Services you visit)." U.S. News & World Report further discloses that those categories are subject to "Sale" and "Sharing" with "Third-Party Business Partners" and "Third-Party Digital Businesses," and that those categories are made available to those recipients for "Targeting advertisements" and related processing purposes. These admitted categories, search activity, browsing history, content interactions, and inferences derived from the specific pages a visitor accesses on the U.S. News Services, constitute the substance of the visitor's electronic communications with the Website, and are the same categories of

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

content-level browsing data that the Trackers intercepted from Plaintiff.

23. U.S. News & World Report's purposeful direction of its tracking infrastructure at California, its commercial partnerships with California-headquartered Trackers, and its admissions in its own Privacy Policy collectively establish that U.S. News & World Report has purposefully availed itself of the privilege of conducting activities in California and has purposefully directed its conduct at California residents.

24. Plaintiff's claims arise out of and relate to U.S. News & World Report's forum-related conduct. Plaintiff's communications were intercepted on his device in California, while Plaintiff was located in California, by Trackers U.S. News & World Report deliberately embedded on its Website. The interception occurred while Plaintiff was reading content on the Website that U.S. News & World Report targeted to California audiences, and the intercepted data was routed in part to California-based servers operated by The Trade Desk, Inc.

25. Exercising specific personal jurisdiction over U.S. News & World Report in this District comports with constitutional notions of fair play and substantial justice. U.S. News & World Report is an established media and consumer-information company with substantial commercial operations directed at California residents, and U.S. News & World Report cannot reasonably claim surprise or undue burden from being haled into a California federal court to answer claims arising from interception of California residents' communications via Trackers U.S. News & World Report itself embedded on its Website.

26. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because Plaintiff asserts a claim arising under federal law, specifically 18 U.S.C. § 2520, which provides a civil cause of action for violations of 18 U.S.C. § 2511(1)(a) of the Federal Wiretap Act.

27. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a) because those claims are so related to the federal claim that they form part of the same case or controversy under Article III of the United States

7

Constitution.

28.    This Court also has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2), because the total matter in controversy exceeds $5,000,000, exclusive of interest and costs, there are over 100 members of the proposed Class, and at least one Class Member is a citizen of a State different from Defendant's state of citizenship, satisfying CAFA's minimal-diversity requirement.

29.    Venue is proper in the Central District of California pursuant to 28 U.S.C. § 1391(b) because (1) Defendant regularly transacts business in this District, operates the Website that serves California residents in this District, and is subject to personal jurisdiction here; (2) a substantial part of the events or omissions giving rise to the claims occurred within this District, including Plaintiff's California-located use of the Website from his San Bernardino County residence; (3) Plaintiff resides in this District; and (4) Defendant derives substantial revenue from California consumers in this District.

## V.    FEDERAL AND STATE PRIVACY LAWS

### 1.    The California Invasion of Privacy Act (CIPA)

30.    The California Invasion of Privacy Act (CIPA) is a legislative measure designed to safeguard the privacy rights of California residents by prohibiting unauthorized wiretapping and eavesdropping on private communications. The California Legislature recognized the significant threat posed by emerging surveillance technologies, stating that "the development of new devices and techniques for the purpose of eavesdropping upon private communications ... has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society" (Cal. Penal Code § 630).

31.    Despite predating the Internet, CIPA has been applied to email and other Internet communications so long as that application is consistent with the statutory text and purpose. Section 631(a) reaches the interception of email content and online communications and consent under CIPA must be obtained before the interception occurs.

8

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

32.     CIPA's text and history confirm that the Legislature intended to protect core privacy rights, as reflected in § 630's declaration that the statute was enacted to protect the right of privacy of the people of this state. CIPA codifies a substantive right to privacy such that the violations of CIPA alleged herein, which implicate traditional interests in personal privacy, constitute concrete injuries sufficient to establish Article III standing.

33.     Individuals may pursue legal action against violators of Cal. Penal Code § 631 and are entitled to seek $5,000 in statutory penalties per violation. Cal. Penal Code § 637.2(a)(1).

**2.      The Federal Wiretap Act**

34.     The Federal Wiretap Act, enacted as Title III of the Omnibus Crime Control and Safe Streets Act of 1968 and amended by the Electronic Communications Privacy Act (ECPA) of 1986, prohibits the intentional interception of wire, oral, or electronic communications. Congress enacted the statute to safeguard the privacy of communications against unauthorized interception, recognizing that unchecked surveillance technology poses a fundamental threat to individual liberty.

35.     The Federal Wiretap Act applies to communications transmitted over the Internet. The 1986 ECPA amendments expressly extended the statute's protections to electronic communications as defined under 18 U.S.C. § 2510(12) to include "any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic or photooptical system that affects interstate or foreign commerce." That includes data transmitted over the internet such as the contents of web browsing activity via HTTP requests as alleged here.

36.     A person whose electronic communications are intercepted in violation of 18 U.S.C. § 2511 may bring a civil action pursuant to 18 U.S.C. § 2520(a). Available relief includes the greater of actual damages or statutory damages of $100 per day for each day of violation or $10,000, whichever is greater, plus punitive damages in

appropriate cases, reasonable attorney's fees, and other litigation costs reasonably incurred.

## VI.   SPECIFIC ALLEGATIONS

37.   During his use of the Website, Plaintiff navigated to the following pages, unaware that Defendant was causing and permitting Third Parties to intercept the content of his communications:

- https://www.usnews.com/search?int=homepage-homepage-header&q=lgbtq;
- https://www.usnews.com/search?int=homepage-homepage-header&q=abortion;
- https://www.usnews.com/news/cities/articles/2019-07-11/cities-in-georgia-pass-laws-granting-lgbtq-rights;
- https://www.usnews.com/education/best-colleges/applying/articles/how-to-find-an-lgbtq-friendly-college; and
- https://www.usnews.com/news/national-news/articles/quotes-comparing-trumps-stance-on-abortion-over-time.

38.   Plaintiff alleges on information and belief that the tracking mechanisms described below operated on the Website during Plaintiff's visits to the URLs identified above and intercepted the substantive contents of his communications with the Website. Beyond the URLs, each Tracker receives, during each of those page loads, the page URLs identifying the content Plaintiff was viewing transmitted as named payload parameters (Comscore in the c7 parameter; LiveIntent in the pu parameter; The Trade Desk in the page field of its POST body), and the Referer header identifying the source page. Each of those fields communicates the substance, purport, or meaning of what Plaintiff was reading or searching for on the Website, and is therefore content of Plaintiff's electronic communications within the meaning of Cal. Penal Code § 631(a) and 18 U.S.C. § 2510(8). Each Tracker section below illustrates what occurs during live

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

browser access to those pages.

**1.**    ***The Comscore Tracker***

39.    Defendant embedded and deployed a Comscore tracking pixel on the Website, operated by Comscore, Inc. (also branded as Scorecardresearch) through its audience-measurement and behavioral-tracking platform. The Comscore pixel fires automatically when a user visits the Website, transmitting U.S. News & World Report's Publisher/Site ID and the full URL of each page a visitor views to Comscore's servers at sb.scorecardresearch.com, and simultaneously placing persistent third-party tracking cookies on the visitor's browser at the .scorecardresearch.com domain. Comscore, Inc. operates one of the largest audience-measurement and behavioral-tracking platforms in the United States, using intercepted browsing data for audience measurement, behavioral profiling, audience segmentation, and cross-session and cross-site user tracking.

40.    Figure 1 is a Fiddler Classic raw request capture showing an outbound request transmitted to Comscore (Scorecardresearch) at sb.scorecardresearch.com during the load of usnews.com/search?int=homepage-homepage-header&q=abortion, the Website's on-site search results page for the term "abortion." The request transmits c2=11307981 (U.S. News & World Report's Publisher/Site ID), c7 carrying the page URL as a named parameter, and a Referer header confirming the source page. The c7 parameter contains the full page URL in human-readable form, establishing content-level tracking, and the c2 value identifies U.S. News & World Report as the publisher transmitting data to Comscore.

/ / /

/ / /

/ / /

11

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

**<u>Figure 1</u>**



41.   Figure 2 is a Fiddler Classic raw request capture showing an outbound request transmitted to Comscore at sb.scorecardresearch.com during the load of usnews.com/news/cities/articles/2019-07-11/cities-in-georgia-pass-laws-granting-lgbtq-rights, the Website's article on Georgia cities adopting LGBTQ rights ordinances. The request transmits the same c2=11307981 (Publisher/Site ID), the page URL in the c7 parameter, and a Referer header confirming the source page. The persistence of the same c2 value across this and Figure 1 demonstrates that the U.S. News & World Report-Comscore publisher relationship transmits data across multiple sensitive page loads.

/ / /

/ / /

/ / /

12

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

**Figure 2**

42.    Figure 3 is a Fiddler Classic raw request capture showing an outbound request transmitted to Comscore at sb.scorecardresearch.com during the load of usnews.com/education/best-colleges/applying/articles/how-to-find-an-lgbtq-friendly-college, the Website's article on identifying LGBTQ-friendly colleges. The request transmits c2=11307981 (Publisher/Site ID), the page URL in the c7 parameter, and a Referer header confirming the source page. The c2 identifier persists across this and the prior Comscore captures, with the c7 parameter carrying each successive sensitive URL to Comscore.

/ / /

/ / /

/ / /

13

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

**Figure 3**



43.    Comscore's servers at sb.scorecardresearch.com returned an HTTP 204 No Content response to the /b tracking pings, confirming that Comscore received and processed the transmitted data in real time, during the transmission of Plaintiff's communications with the Website.

44.    Comscore, Inc. and its operators used the intercepted content of Plaintiff's communications with the Website concerning sexual orientation, reproductive health, and related sensitive content, including the page URLs (in the c7 parameter) and the source-page URLs (in the Referer header) (each transmitted to Comscore as a separate named field), to build cross-session audience-measurement and behavioral profiles tied to the persistent UID and XID identifiers stored on the .scorecardresearch.com domain, and to supply U.S. News & World Report's audience-measurement and ad-targeting workflows with audience-segmentation signals derived from that content. This commercial use of intercepted content is precisely what the Comscore audience-measurement platform is designed and marketed to accomplish.

45.    Comscore, Inc. is not a party to the communications between Plaintiff and the Website; it is a third-party interceptor that surreptitiously duplicated and captured

those communications as they occurred. Defendant aided and abetted Comscore, Inc.'s interception by embedding and configuring the Comscore tracking pixel on the Website. By causing Comscore, Inc. to intercept the contents of Plaintiff's electronic communications with the Website in this manner, Defendant violated Cal. Penal Code § 631 and 18 U.S.C. § 2511(1)(a).

**2.      *The LiveIntent Tracker***

46.      Defendant embedded and deployed a LiveIntent tracking mechanism on the Website, operated by LiveIntent, Inc. through its identity-resolution and people-based marketing platform. The LiveIntent mechanism fires automatically when a user visits the Website, transmitting a persistent device-user identifier and the full URL of each page a visitor views to LiveIntent's servers at rp.liadm.com and rp4.liadm.com, and is associated with persistent third-party tracking cookies on the visitor's browser at the .liadm.com domain. LiveIntent, Inc. operates one of the largest identity-resolution platforms serving the digital advertising industry, using intercepted browsing data for cross-publisher behavioral profiling, identity resolution, audience segmentation, and people-based ad targeting.

47.      Figure 4 is a Fiddler Classic raw request capture showing an outbound request transmitted to LiveIntent at rp.liadm.com during the load of usnews.com/news/cities/articles/2019-07-11/cities-in-georgia-pass-laws-granting-lgbtq-rights. The request transmits a persistent Live Connect device-user identifier in the duid parameter (LiveIntent's persistent identifier value), the visited-page URL in the pu parameter, and a Referer header confirming the source page. The duid parameter transmits a unique persistent identifier to LiveIntent, enabling cross-session and cross-publisher user tracking, and the pu parameter confirms that the exact page content context is sent to LiveIntent.

/ / /

/ / /

15

**Figure 4**

48.    Figure 5 is a Fiddler Classic raw request capture showing an outbound request transmitted to LiveIntent at rp.liadm.com during the load of usnews.com/education/best-colleges/applying/articles/how-to-find-an-lgbtq-friendly-college. The request transmits LiveIntent's persistent duid parameter, the page URL in the pu parameter, and a Referer header confirming the source page. The same duid parameter accompanying each LiveIntent transmission enables cross-session and cross-publisher user tracking by linking each page transmission to a continuing LiveIntent user profile.

/ / /

/ / /

/ / /

16

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

**Figure 5**



49.    Figure 6 is a Fiddler Classic raw request capture showing an outbound request transmitted to LiveIntent at rp.liadm.com during the load of usnews.com/news/national-news/articles/quotes-comparing-trumps-stance-on-abortion-over-time, the Website's article comparing prior Trump statements on abortion. The request transmits LiveIntent's persistent duid parameter, the page URL in the pu parameter, and a Referer header confirming the source page. The pu parameter transmits the article URL to LiveIntent, while the duid parameter links the transmission to LiveIntent's persistent profile of the user across sessions and publishers.

/ / /

/ / /

/ / /

17

**Figure 6**



50.      LiveIntent's servers returned HTTP responses to the LiveIntent requests (HTTP 302 Found on rp.liadm.com/j and HTTP 200 OK on rp4.liadm.com/j), confirming that LiveIntent received and processed the transmitted data in real time, during the transmission of Plaintiff's communications with the Website.

51.      LiveIntent, Inc. and its operators used the intercepted content of Plaintiff's communications with the Website concerning sexual orientation, reproductive health, and related sensitive content, including the page URLs (in the pu parameter) and the source-page URLs (in the Referer and refr parameters) (each transmitted to LiveIntent as a separate named field), to build cross-session and cross-publisher audience profiles tied to the persistent duid identifier (LiveIntent's Live Connect device-user identifier), and to supply LiveIntent's customer-data infrastructure with people-based identity-resolution and ad-targeting signals derived from that content. This commercial use of intercepted content is precisely what the LiveIntent identity-resolution platform is designed and marketed to accomplish.

52.      LiveIntent, Inc. is not a party to the communications between Plaintiff and the Website; it is a third-party interceptor that surreptitiously duplicated and captured those communications as they occurred. Defendant aided and abetted LiveIntent, Inc.'s

18

interception by embedding and configuring the LiveIntent tracking mechanism on the Website. By causing LiveIntent, Inc. to intercept the contents of Plaintiff's electronic communications with the Website in this manner, Defendant violated Cal. Penal Code § 631 and 18 U.S.C. § 2511(1)(a).

**3.    *The Trade Desk Tracker***

53.    Defendant embedded and deployed a Trade Desk programmatic-advertising bid mechanism on the Website, operated by The Trade Desk, Inc. through its demand-side advertising platform. The Trade Desk mechanism fires automatically when a user visits the Website, transmitting the full URL of each page a visitor views and a persistent buyer/user identifier (TDID) to The Trade Desk's bid endpoint at direct.adsrvr.org, and simultaneously placing or maintaining a persistent third-party tracking cookie (TDID) on the visitor's browser at the .adsrvr.org domain. The Trade Desk, Inc. operates one of the largest demand-side platforms in programmatic advertising, using intercepted browsing data for behavioral profiling, audience segmentation, real-time bidding, and interest-based advertising.

54.    Figure 7 is a Fiddler Classic raw request capture showing an outbound POST request transmitted to The Trade Desk at direct.adsrvr.org/bid/bidder/usnews during the load of usnews.com/news/cities/articles/2019-07-11/cities-in-georgia-pass-laws-granting-lgbtq-rights. The POST body transmits the full page URL in the page field and a persistent buyer/user identifier in the buyeruid field carrying the TDID value, alongside the OpenRTB site.page field carrying the source page URL and a Referer header confirming the source page. The page field transmits the exact page URL to The Trade Desk, and the buyeruid field links the transmission to The Trade Desk's persistent profile of the user across sessions and sites.

/ / /

/ / /

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

**Figure 7**



55.    Figure 8 is a Fiddler Classic raw request capture showing an outbound POST request transmitted to The Trade Desk at direct.adsrvr.org/bid/bidder/usnews during the load of usnews.com/education/best-colleges/applying/articles/how-to-find-an-lgbtq-friendly-college. The POST body transmits the full page URL in the page field, the persistent TDID-bearing buyeruid field, the OpenRTB site.page field, and a Referer header confirming the source page. The persistence of the same TDID value in the buyeruid field across this and Figure 7 enables cross-session and cross-site user tracking and links each successive page transmission to a continuing Trade Desk profile.

/ / /

/ / /

/ / /

20

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

**Figure 8**



56.     Figure 9 is a Fiddler Classic raw request capture showing an outbound POST request transmitted to The Trade Desk at direct.adsrvr.org/bid/bidder/usnews during the load of usnews.com/news/national-news/articles/quotes-comparing-trumps-stance-on-abortion-over-time. The POST body transmits the full page URL in the page field, the persistent TDID buyeruid identifier, the OpenRTB site.page field, and a Referer header confirming the source page.

/ / /

/ / /

/ / /

21

**Figure 9**



57.    The Trade Desk's servers at direct.adsrvr.org returned an HTTP 200 OK response to the bid POST requests, confirming that The Trade Desk received and processed the transmitted data in real time, during the transmission of Plaintiff's communications with the Website.

58.    The Trade Desk, Inc. and its operators used the intercepted content of Plaintiff's communications with the Website concerning sexual orientation, reproductive health, and related sensitive content, including the page URLs (in the page field of the Trade Desk POST body) and the source-page URLs (in the Referer header and OpenRTB site.page field) (each transmitted to The Trade Desk as a separate named field), to build cross-session and cross-site behavioral profiles tied to the persistent TDID identifier stored on the .adsrvr.org domain with a two-year expiration, and to supply The Trade Desk's demand-side advertising platform with audience-segmentation and bid-targeting signals derived from that content. This commercial use of intercepted content is precisely what The Trade Desk programmatic-advertising platform is designed and marketed to accomplish.

/ / /

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

59.    The Trade Desk, Inc. is not a party to the communications between Plaintiff and the Website; it is a third-party interceptor that surreptitiously duplicated and captured those communications as they occurred. Defendant aided and abetted The Trade Desk, Inc.'s interception by embedding and configuring the Trade Desk programmatic-advertising mechanism on the Website. By causing The Trade Desk, Inc. to intercept the contents of Plaintiff's electronic communications with the Website in this manner, Defendant violated Cal. Penal Code § 631 and 18 U.S.C. § 2511(1)(a).

**4.    *Persistent Identifier Storage Across the Trackers***

60.    The Trackers' persistent identifier mechanisms are stored on the visitor's browser as cookies. Figures 10 through 12 are Chrome DevTools Application panel captures showing the browser's cookie storage during the load of three of the sensitive URLs identified above. The persistence of these identifier cookies across the Website's sensitive page loads, with expirations extending into 2027, confirms long-term tracking capability across the three Trackers.

61.    Figure 10 is a Chrome DevTools Application panel capture showing the browser's cookie storage during the load of usnews.com/search?int=homepage-homepage-header&q=abortion. The Cookies panel identifies persistent third-party tracking cookies stored on the visitor's browser, including Comscore's UID and XID identifier cookies on the .scorecardresearch.com domain, The Trade Desk's TDID identifier cookie on the .adsrvr.org domain, and LiveIntent's lidid identifier cookie on the .liadm.com domain. These cookies act as persistent identifiers for the three Trackers, and their domains, expiration dates, and same-site flags facilitate long-term cross-session and (as to third-party domains) cross-site identification of the visitor.

///

///

23

**Figure 10**



62.    Figure 11 is a Chrome DevTools Application panel capture showing the browser's cookie storage during the load of usnews.com/news/cities/articles/2019-07-11/cities-in-georgia-pass-laws-granting-lgbtq-rights. The same persistent third-party tracking cookies are present, including Comscore's UID and XID on .scorecardresearch.com, The Trade Desk's TDID on .adsrvr.org, and LiveIntent's lidid on .liadm.com. The presence of the same persistent tracking cookies across this and Figure 10 confirms that the Trackers' identifier inventory persists across sensitive page loads, supporting cross-session and cross-site user tracking by Comscore, LiveIntent, and The Trade Desk.

/ / /

/ / /

/ / /

24

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

**Figure 11**



63.     Figure 12 is a Chrome DevTools Application panel capture showing the browser's cookie storage during the load of usnews.com/news/national-news/articles/quotes-comparing-trumps-stance-on-abortion-over-time.     The same persistent third-party tracking cookies are present, including Comscore's UID and XID on .scorecardresearch.com, The Trade Desk's TDID on .adsrvr.org, and LiveIntent's lidid on .liadm.com. Cookie storage is the primary persistent-identifier mechanism for these Trackers in this session, and the expiration dates (extending into 2027) confirm long-term tracking capability across multiple third-party platforms.

/ / /

/ / /

/ / /

25

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

**Figure 12**



64. Together, Figures 10 through 12 confirm that each Tracker maintains a persistent identifier mechanism on the visitor's browser that survives across multiple sensitive page loads in a single session, enabling each Tracker to link Plaintiff's communications with the Website to a continuing user profile across sessions, devices, and contexts.

## VII.   CLASS ALLEGATIONS

65. Plaintiff brings this action individually and on behalf of all others similarly situated (the "Class" or "Class Members") defined as follows:

> All persons within California whose electronic communications with the Website, including the URL contents of their HTTP requests to the Website were intercepted by one or more Trackers between April 28, 2025 and the present.

66. NUMEROSITY: Plaintiff does not know the number of Class Members but believes the number to be in the thousands, if not more. The exact identities of Class Members can be ascertained by the records maintained by Defendant.

/ / /

26

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

67. COMMONALITY: Common questions of fact and law exist as to all Class Members and predominate over any questions affecting only individual members of the Class. Such common legal and factual questions include but are not limited to:

- Whether Defendant configured the Website to transmit the URL contents of visitors' HTTP requests to the Trackers;
- Whether the URL contents of those requests constitute "contents" of electronic communications within the meaning of Cal. Penal Code § 631(a) and 18 U.S.C. § 2510(8);
- Whether Defendant's conduct constitutes interception of electronic communications in violation of Cal. Penal Code § 631(a);
- Whether Defendant's conduct constitutes intentional interception of electronic communications in violation of 18 U.S.C. § 2511(1)(a);
- Whether Defendant's conduct constitutes an unlawful or unfair business practice under Cal. Bus. & Prof. Code § 17200;
- Whether Plaintiff and Class Members are entitled to statutory damages;
- Whether Class Members are entitled to injunctive relief;
- Whether the Defendant's conduct violates the California Constitution;
- Whether the Defendant's conduct constitutes an intrusion upon seclusion;
- Whether Class Members are entitled to disgorgement of data unlawfully obtained; and
- Whether Class Members are entitled to restitution.

68. TYPICALITY: As a person who visited the Website and whose URL contents were intercepted by the Trackers, Plaintiff is asserting claims that are typical of the Class Members. Plaintiff's experience with the Trackers is typical to Class Members.

69. ADEQUACY: Plaintiff will fairly and adequately protect the interests of the members of the Class. Plaintiff has retained attorneys experienced in class action litigation. All individuals with interests that are actually or potentially adverse to or in

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

conflict with the Class or whose inclusion would otherwise be improper are excluded.

70. SUPERIORITY: A class action is superior to other available methods of adjudication because individual litigation of the claims of all Class Members is impracticable and inefficient. Even if every Class Member could afford individual litigation, the court system could not. It would be unduly burdensome to the courts in which individual litigation of numerous cases would proceed. Individualized litigation also presents a potential for inconsistent or contradictory judgments.

## VIII. **FIRST CAUSE OF ACTION**

### **Violations of Cal. Penal Code § 631**

### **By Plaintiff and the Class Members Against All Defendants**

71. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

72. Plaintiff brings this cause of action on behalf of himself and the Class.

73. California Penal Code § 631(a) prohibits any person from willfully and without the consent of all parties to the communication reading, or attempting to read, or learning the contents or meaning of any message, report, or communication while the same is in transit, and from using or attempting to use, in any manner or for any purpose, any information so obtained.

74. The full URLs of Plaintiff's and Class members' HTTP requests to the Website constitute the "contents" of those communications within the meaning of § 631(a). As described in the preceding tracker-specific allegations, the Trackers received human readable copies of URL strings in the same HTTP request or response in which the Website servers received it, while that communication was in transit between Plaintiff's browser and the Website.

75. Defendant intentionally configured its website to transmit Plaintiff's and Class members' URL contents to the Trackers, itself received and used those URL contents for audience segmentation and ad targeting, and permitted the Trackers to use that information for user profiling and targeted advertising. The Trackers are third parties

28

to the communications between Plaintiff and the Website. Plaintiff and Class members did not consent to interception of the contents of their communications by any Tracker, and no other exception to § 631(a) applies.

76.    Each interception constitutes a separate violation of § 631(a). Plaintiff and the Class are entitled to recover the greater of actual damages or $5,000 per violation pursuant to Cal. Penal Code § 637.2(a)(1), injunctive relief, and such other relief as the Court deems just and proper.

## IX.    SECOND CAUSE OF ACTION

### Violations of 18 U.S.C. § 2511(1)(a)

### By Plaintiff and the Class Members Against All Defendants

77.    Plaintiff re-alleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

78.    Plaintiff brings this cause of action on behalf of himself and the Class.

79.    18 U.S.C. § 2511(1)(a) prohibits any person from intentionally intercepting any wire, oral, or electronic communication. The Federal Wiretap Act defines "contents" to include any information concerning the substance, purport, or meaning of a communication. 18 U.S.C. § 2510(8).

80.    The full URLs of Plaintiff's and Class members' HTTP requests to the Website are "contents" of electronic communications within the meaning of 18 U.S.C. § 2510(8). Those URLs communicate the substance and meaning of Plaintiff's and Class members' browsing. As described in the preceding tracker-specific allegations, the Trackers intercepted URL contents in real time, in the same HTTP request or response in which the Website's servers received them, while those communications were in transit.

81.    Defendant intentionally configured its website to transmit Plaintiff's and Class members' URL contents to each Tracker, itself received and used those URL contents for audience segmentation and ad targeting, and permitted each Tracker to use that information for user profiling and targeted advertising. The Trackers are third parties

29

to the communications between Plaintiff and the Website. Plaintiff and Class members did not consent to this interception, and no other exception applies.

82. Plaintiff and the Class are entitled to relief under 18 U.S.C. § 2520, including the greater of actual damages plus any profits made by Defendant through the interception, or statutory damages of $100 per day per violation or $10,000, whichever is greater, together with punitive damages, reasonable attorney's fees, and litigation costs.

## X.   THIRD CAUSE OF ACTION

### Violations of Business & Professions Code § 17200

### By Plaintiff and the Class Members Against All Defendants

83. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

84. Plaintiff brings this cause of action on behalf of himself and the Class.

85. California Business and Professions Code § 17200 prohibits any unlawful, unfair, or fraudulent business act or practice. Defendant's conduct constitutes both an unlawful and an unfair business practice.

86. Defendant's conduct is unlawful. By facilitating the interception of the contents of Plaintiff's and Class members' electronic communications without consent, Defendant violated California Penal Code § 631(a) and 18 U.S.C. § 2511(1)(a). Each statutory violation constitutes a predicate unlawful business act or practice under § 17200.

87. Defendant's conduct is also unfair. Defendant covertly transmitted Plaintiff's and Class members' URL contents to third-party Trackers for commercial monetization without disclosure, authorization, or compensation. The harm to Plaintiff and the Class including but not limited to the interception and commercial exploitation of sensitive personal information and the financial value thereof is substantial, is not outweighed by any legitimate countervailing benefit, and could not reasonably have been avoided by Plaintiff or Class members.

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

88.     Plaintiff and Class members suffered injury in fact and lost money or property as a result of Defendant's conduct. Browsing data identifying the specific content a user views, including browsing URLs of the kind intercepted here, has recognized and quantifiable economic value in the digital advertising marketplace. Each Tracker enabled by Defendant used that intercepted URL content to build behavioral profiles and to participate in real-time bidding auctions in which advertisers pay measurable clearing prices for access to audiences identified by precisely this kind of browsing activity.

89.     Plaintiff and Class members provided their browsing data as implicit consideration for access to the Website, a data-for-services exchange that was not disclosed and to which they did not consent. Defendant and the Trackers are designed to and on information and belief did capture the economic benefit of that exchange, in the form of advertising revenue and RTB clearing prices generated by the Trackers' use of users' intercepted URL data, without compensating Plaintiff or Class members. Plaintiff and Class members were thereby deprived of the economic value of their data and of the full value of a privacy-protective browsing experience they reasonably expected and would have bargained for had the exchange been disclosed.

90.     Plaintiff and the Class are entitled to injunctive relief prohibiting Defendant from continuing its unlawful and unfair practices, restitution of monies acquired by Defendant through those practices, and reasonable attorney's fees pursuant to California Code of Civil Procedure § 1021.5.

## XI.     FOURTH CAUSE OF ACTION

### Violation of the California Constitution, Article I, Section 1

### By Plaintiff and the Class Members Against All Defendants

91.     Plaintiff re-alleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

92.     Plaintiff brings this cause of action on behalf of himself and the Class.

93.     Article I, Section 1 of the California Constitution provides that privacy is

31

among the inalienable rights of all people in California. To state a claim for violation of the constitutional right to privacy, a plaintiff must establish: (1) a legally protected privacy interest; (2) a reasonable expectation of privacy in the circumstances; and (3) conduct by the defendant constituting a serious invasion of privacy.

94.    Plaintiff and Class Members have a legally protected privacy interest in the contents of their electronic communications with the Website, including the specific page URLs reflecting their browsing activity. California law recognizes a legally protected privacy interest in personal browsing activity, particularly when that activity is covertly intercepted by commercial third parties for advertising and profiling purposes without disclosure or consent.

95.    Plaintiff and Class Members had a reasonable expectation of privacy in the contents of their electronic communications with the Website. A reasonable person visiting an online news, education, health, and consumer-information website providing news reporting, college and graduate-school rankings, hospital and healthcare quality information, and consumer-information content does not expect that the specific pages they browse will be covertly transmitted to multiple separate third-party commercial tracking companies in real time, linked to persistent cross-session user profiles, and used for advertising targeting, behavioral analytics, and commercial monetization.

96.    Defendant's conduct constitutes a serious invasion of that privacy. By deliberately embedding and configuring three third-party tracking technologies on the Website, Defendant caused the real-time, covert interception of the URL contents of Plaintiff's and Class Members' electronic communications and their transmission to third parties where they were linked to persistent cross-session profiles and used for commercial advertising and analytics purposes without Plaintiff's knowledge or consent. The severity of the invasion is heightened by the nature of the news, education, health, and consumer-information website, the sensitivity of the content browsed, the persistent and cross-platform nature of the identifiers used, and the commercial exploitation of the intercepted data.

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

97. As a result of Defendant's invasion of their privacy, Plaintiff and Class Members have suffered harm, including loss of privacy, loss of control over their personal information, and the unauthorized commercial exploitation of their browsing activity. Plaintiff and the Class seek injunctive relief, nominal damages, and all other relief authorized by law.

## XII. FIFTH CAUSE OF ACTION

### Intrusion Upon Seclusion

### By Plaintiff and the Class Members Against All Defendants

98. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

99. Plaintiff brings this cause of action on behalf of himself and the Class.

100. The common law tort of intrusion upon seclusion requires: (1) an intentional intrusion, physically or otherwise, into a place, conversation, or matter in which the plaintiff has a reasonable expectation of privacy; and (2) that the intrusion would be highly offensive to a reasonable person.

101. Defendant intentionally intruded into Plaintiff's and Class Members' electronic communications with the Website by deliberately embedding three third-party tracking technologies that intercepted the URL contents of those communications in real time and transmitted them to third parties without Plaintiff's knowledge or consent. Plaintiff had a reasonable expectation of privacy in the contents of those communications.

102. The intrusion is highly offensive to a reasonable person. Defendant covertly deployed tracking technologies that captured the specific content Plaintiff was browsing and transmitted it to multiple third-party commercial entities for advertising targeting and behavioral profiling. The covert and non-consensual nature of the interception, the nature of the Website and the sensitivity of the content browsed, the commercial exploitation of the intercepted browsing activity for advertising and data analytics purposes, and the use of persistent cross-session identifiers to build comprehensive user

33

profiles without disclosure all render the intrusion highly offensive to a reasonable person.

103.   As a result of Defendant's intrusion upon their seclusion, Plaintiff and Class Members have suffered harm, including loss of privacy, emotional distress, and the unauthorized exploitation of their personal information. Plaintiff and the Class seek compensatory damages, nominal damages, injunctive relief, and all other appropriate relief.

## XIII.  SIXTH CAUSE OF ACTION

### Unjust Enrichment

### By Plaintiff and the Class Members Against All Defendants

104.   Plaintiff re-alleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

105.   Plaintiff brings this cause of action on behalf of himself and the Class.

106.   Unjust enrichment requires: (1) a benefit conferred on the defendant; (2) at the expense of the plaintiff; and (3) circumstances that make it inequitable for the defendant to retain the benefit without compensating the plaintiff.

107.   Defendant received a benefit by permitting third parties to deploy their tracking technologies on the Website. In exchange for allowing these third parties to intercept and collect the URL contents of visitors' communications with the Website, Defendant received monetary compensation, data licensing benefits, promotional support, or other commercial value. Defendant's arrangement with these tracking operators enabled it to offer analytics, retargeting, and advertising services that generated commercial revenue and business value.

108.   Defendant received this benefit at Plaintiff's and Class Members' expense. Plaintiff's and Class Members' browsing data constitutes personal property with recognized economic value in the digital advertising marketplace. By intercepting the URL contents of Plaintiff's communications and transmitting them to third-party trackers, Defendant and its tracking partners extracted the commercial value of that data

34

without compensation. Plaintiff and Class Members also suffered the loss of control over their personal information, which has recognized economic value as a privacy-protective property interest.

109. It is inequitable for Defendant to retain the benefits of its data-for-services arrangement without compensating Plaintiff and Class Members whose browsing activity was the source of that commercial value. Defendant's concealment of the tracking arrangement and its failure to obtain Plaintiff's and Class Members' informed consent render retention of those benefits unjust.

110. Plaintiff and the Class seek restitution and disgorgement of all amounts by which Defendant was unjustly enriched at Plaintiff's and Class Members' expense.

## XIV.  **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for the following:

1. An order certifying the Class, naming Plaintiff as Class representative, and naming Plaintiff's attorneys as Class counsel;

2. An order declaring that Defendant's conduct violates Cal. Penal Code § 631(a), 18 U.S.C. § 2511(1)(a), Cal. Bus. & Prof. Code § 17200, et seq., Article I, Section 1 of the California Constitution, and the common law prohibition against intrusion upon seclusion;

3. An order enjoining Defendant from continuing the conduct alleged herein;

4. Statutory damages pursuant to Cal. Penal Code § 637.2(a)(1) of $5,000 per violation;

5. Statutory damages pursuant to 18 U.S.C. § 2520 of the greater of actual damages plus any profits made by Defendant through the violation, or $100 per day per violation or $10,000, whichever is greater;

6. Punitive damages pursuant to 18 U.S.C. § 2520;

7. Restitution pursuant to Cal. Bus. & Prof. Code § 17200, et seq.;

/ / /

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

8. Nominal damages and injunctive relief for violation of Article I, Section 1 of the California Constitution;

9. Compensatory and nominal damages for intrusion upon seclusion;

10. Restitution and disgorgement of all amounts by which Defendant was unjustly enriched at Plaintiff's and Class Members' expense;

11. Prejudgment interest;

12. Reasonable attorney's fees and costs; and

13. Such other and further relief as the Court deems just and proper.

### DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all causes of action and issues so triable.

Respectfully submitted,

Dated:   May 20, 2026        **LAW OFFICES OF ROSS CORNELL, APC**

By: */s/ Ross C. Cornell*
Ross Cornell, Esq. (SBN 210413)
P.O. Box 1989 #305
Big Bear Lake, CA 92315
Office: (562) 612-1708
Email: rc@rosscornelllaw.com

**NATHAN & ASSOCIATES, APC**
Reuben D. Nathan
2901 W. Coast Hwy., Suite 200
Newport Beach, CA 92663
Office: (949) 270-2798
Email: rnathan@nathanlawpractice.com

*Attorneys for Plaintiff and the Putative Class*

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED